



FILED
Jun 05 2019, 11:18 am
CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

IN THE

# Indiana Supreme Court

Supreme Court Case No. 19S-PL-342

## Town of Brownsburg, Indiana, et al.,
*Appellants/Cross-Appellees,*

—v—

## Fight Against Brownsburg Annexation, et al.,
*Appellees/Cross-Appellants.*

---

Argued: September 20, 2018 | Decided: June 5, 2019

Appeal from the Hendricks Superior Court, No. 32D02-1310-PL-109
The Honorable Heather Welch, Special Judge

On Petition to Transfer from the Indiana Court of Appeals,
No. 32A01-1702-PL-215

---

**Opinion by Justice Slaughter**

**Chief Justice Rush and Justices David, Massa, and Goff concur.**

**Slaughter, Justice.**

In this municipal-annexation case, we hold that a trial court hearing a remonstrance proceeding on judicial review must consider the evidence submitted by both the municipality and the remonstrators. The trial court need not defer to either the municipality's own evidence supporting the annexation or its determination that it met the statutory requirements. Whether the annexation was lawful is a legal question for the trial court. If the court enters special findings of fact and conclusions of law, appellate courts are to apply the standard of review provided in Trial Rule 52. We provide guidance for applying the undefined statutory terms "subdivided" and "reasonably near future" and, on this record, affirm the trial court's judgment for the Remonstrators and against the Town of Brownsburg.

# Factual and Procedural History

In 2013, Brownsburg adopted an ordinance to annex 4,462 acres of property adjacent to the Town. A group of affected landowners, acting through a political action committee, Fight Against Brownsburg Annexation, remonstrated and sought a declaration that the Town did not meet the statutory annexation requirements.

Under the statute, a municipality wanting to annex land must prove several things. Ind. Code § 36-4-3-13(a) (2013 Repl.). Among them are, first, that the municipality has adopted a written fiscal plan to ensure the municipality can afford to provide services to those living in the proposed annexation territory, *id*. § 36-4-3-13(d); second, that the proposed territory is sufficiently contiguous to the municipality's current boundaries, *id*. §§ 36-4-3-13(b)(1), 36-4-3-13(c)(1); and, third, that **either** the proposed territory is sufficiently urban under criteria recited in the statute, *id*. § 36-4-3-13(b)(2), **or** the municipality will use the territory for development in the "reasonably near future", *id*. § 36-4-3-13(c)(2).

After a three-day bench trial, the court entered extensive findings of fact and conclusions of law and determined that the Town had not met all statutory requirements for annexing the proposed territory. The court thus

entered judgment for the Remonstrators and against the Town. The Town
then appealed, the Remonstrators cross-appealed, and the court of appeals
affirmed. *Town of Brownsburg v. Fight Against Brownsburg Annexation*, 98
N.E.3d 114 (Ind. Ct. App. 2018). The Town sought transfer, which we now
grant, thus vacating the appellate decision.

# Discussion and Decision

## A. Standards of Review

At issue here are two standards of review. The first deals with the
nature and extent of an appellate court's review of a trial court's findings
of fact, conclusions of law, and entry of judgment in an annexation case.
The second is the degree to which a trial court must defer to a
municipality's determination that it has met the applicable criteria under
the annexation statute. The Town argues that the trial court paid
insufficient deference to the Town's determination to annex the proposed
territory in a manner consistent with the governing statute.

## 1. Appellate review of trial-court's judgment

Our standard of appellate review in annexation cases is well-settled.
When a trial court enters special findings of fact and conclusions of law, as
the court below did here, we apply the standard of review set forth in
Trial Rule 52. *Town of Fortville v. Certain Fortville Annexation Territory
Landowners*, 51 N.E.3d 1195, 1198 (Ind. 2016). For purposes of appellate
review, that means we review what the trial court found and concluded,
not what the municipality did. In other words, we ask not whether the
record supports the municipality's decision to enact the annexation
ordinance, but whether it supports the trial court's decision to uphold or
reject the annexation.

First, we consider whether the evidence supports the trial court's
findings. We will not set aside findings unless they are clearly
erroneous—*i.e.*, the record contains no facts supporting them either

directly or inferentially. *Id*. This standard is highly deferential. If a factual finding is plausible given the entire record, we will not reverse it even if we would have decided the matter differently were we sitting as finders of fact. We give great deference to a court's findings because of its capacity to judge witness credibility. This standard applies equally to expert testimony. "The weight to be accorded expert testimony as well as lay testimony[] is the exclusive province of the trier of fact which is at liberty to discount it or to reject it in the face of lay testimony, which it finds more persuasive." *Fordyce v. State*, 425 N.E.2d 108, 110 (Ind. 1981) (citation omitted). Thus, the trier of fact—not a reviewing court—decides the weight and credibility to give the testimony of dueling experts. We will reject a finding as clearly erroneous only if we are left with the definite and firm conviction, based on all the evidence, that the court erred. *Fortville,* 51 N.E.3d at 1198 (citing *Yanoff v. Muncy*, 688 N.E.2d 1259, 1262 (Ind. 1997)).

Next, we ask whether the findings support the court's legal conclusions. We give no deference to conclusions of law but review them de novo. *In re Marriage of Gertiser*, 45 N.E.3d 363, 369 (Ind. 2015). The court's ultimate judgment—who wins on which counts or claims, and who loses—must follow from the conclusions of law and is clearly erroneous if the court applied the "wrong legal standard to properly found facts." *Fortville*, 51 N.E.3d at 1198 (citing *Yanoff,* 688 N.E.2d at 1262).

Here, the Town appeals from a negative judgment—one adverse to the party with the burden of proof at trial. Under our case law, the party challenging a negative judgment generally must show on appeal that "the evidence as a whole … leads unerringly and unmistakably to a decision opposite that reached by the trial court." *Spranger v. State*, 650 N.E.2d 1117, 1119 (Ind. 1995) (citations omitted). The Town argues that the court of appeals erred by referencing the negative-judgment standard, 98 N.E.3d at 118-19, and emphasizes that *Fortville*, which also involved a municipality appealing from a negative judgment, applied only the Rule 52 standard.

Given our analysis and holding in *Fortville*, we agree with the Town that the negative-judgment standard does not apply in annexation cases. Although the court of appeals mentioned this standard, it does not seem

to have applied it. Throughout its opinion, the court assessed the trial court's decision under Rule 52's "clearly erroneous" standard, *id*. at 125, 130, which is the correct standard. We note that commentators have questioned whether there is any appreciable, discernible difference between these two standards of appellate review—the negative-judgment standard and the Rule 52 standard. As Professor Stroud observed in his influential treatise on Indiana practice, "there is no apparent reason to conceive of a negative judgment review in terms different than sufficiency review." *Spranger*, 650 N.E.2d at 1120 n.1 (quoting Kenneth M. Stroud, 4A *Indiana Practice*, § 12.7 at 144 (1990)). He continued: "the burden imposed upon either losing party on appeal in order to realize reversal, and the standards by which the judgment will be evaluated, are in the final analysis, functionally indistinguishable." *Id*.

There is much practical wisdom in Professor Stroud's observation. It is hard to conceive of a situation where an appellant would satisfy the sufficiency-based "clearly erroneous" standard of Rule 52 yet would fail to meet the supposedly more onerous negative-judgment standard. We yielded to Professor Stroud, in part, in *Spranger* when we "distinguished" the two standards this way: "In one, the inquiry is essentially whether there is **any** way the trial court could have reached its decision. In the other, it is whether there is **no** way the court could have" done so. 650 N.E.2d at 1120 (emphasis in original). Then, we concluded, "Arguably, this is a distinction without a difference." *Id*. (footnote omitted).

Indeed, the practical difference, if any, between these two standards of appellate review is far from clear. But for now, we need not explore further the scope or extent of any such distinction because the parties did not ask us to reconsider prevailing law or to merge these two standards. Cf. *United States v. Boyd*, 55 F.3d 239, 242 (7th Cir. 1995) (Posner, J.) ("as we have sometimes heretically suggested, there are operationally only two degrees of review, plenary (that is, no deference given to the tribunal being reviewed) and deferential") (citations omitted).

## 2. Trial-court review of municipality's annexation decision

Annexation is the statutory process by which municipalities acquire additional territory outside their existing corporate boundaries. Annexation cases today involve two "legislative" choices, by which we mean policy choices for the political branches and not legal questions for the courts.

First, the General Assembly determines whether to permit a municipality to annex additional territory at all and, if so, under what conditions. Over the past two centuries, the legislature has answered this policy question differently, as is its prerogative. For example, on whether to subject municipal annexations to judicial review, this requirement has, at various times, been expressly conferred, expressly withheld, and completely unmentioned.

Second, when the General Assembly allows it, the other "legislative" choice is the municipality's to decide which specific territory to annex, subject to the power of remonstrators to challenge the annexation and of courts to pass on the annexation's legality. "The framework of Indiana's annexation laws has long featured three basic stages: (1) legislative adoption of an ordinance annexing certain territory and pledging to deliver certain services within a fixed period of time; (2) an opportunity for remonstrance by affected landowners; and (3) judicial review." *Fortville*, 51 N.E.3d at 1197 (quoting *City of Carmel v. Steele*, 865 N.E.2d 612, 615 (Ind. 2007)).

Apart from the current scheme, one can imagine a wide array of legislative options concerning whether to allow annexations at all; whether annexations can be challenged; and whether courts are to assess their legality. Regardless of which annexation protocols the General Assembly enacts, it has considerable leeway to subject its own (or municipalities') annexation decisions to varying degrees of judicial review—plenary, limited, or none.

Under current law, remonstrators cannot oppose annexation merely because they do not want to live in the municipality or because they believe annexation will affect them adversely, such as by raising their

taxes or altering their way of life. The General Assembly has created statutory requirements for valid remonstration. These requirements place the burden of pleading on the remonstrators challenging the annexation. *Rogers v. Municipal City of Elkhart*, 688 N.E.2d 1238, 1240 (Ind. 1997). But "the burden of proof is on the municipality to demonstrate compliance with the statute." *Fortville*, 51 N.E.3d at 1198 (citation omitted).

If those objecting to the annexation satisfy the remonstrance procedures, a court must determine whether the municipality satisfied the statutory requirements for annexation. The trial court sits as finder of fact and, after receiving evidence and hearing argument, assesses whether the legal requirements were met. The court does not weigh competing views about the wisdom or desirability of the proposed annexation. Instead, it plays a "limited role" in annexations and must afford "substantial deference" to the municipality's legislative judgment—*i.e.*, to its policy choice to annex the disputed territory. *Id.* (citation omitted). The court's role, however, is not to "sustain blindly" an exercise of such judgment, but to ensure that the municipality did "not exceed[] its authority", and that the "statutory conditions for annexation [were] satisfied." *Id.* (quoting *Chidester v. City of Hobart*, 631 N.E.2d 908, 910 (Ind. 1994)). Stated differently, whether and what to annex are policy choices for the municipality; whether the annexation was lawful is a legal question for the courts.

Neither the governing annexation statute nor separation-of-powers principles compel a different result, despite the Town's contrary argument. In its transfer petition, the Town argues that the "substantial deference" courts owe municipalities' policy choices also applies to legal questions: "If substantial deference is to mean anything, it has to mean that a municipality's reasoned and factually informed understanding of the statutory criteria and the evidence supporting that [sic] criteria must be given priority over the remonstrator's and the trial court's contrary conclusions." What the Town seeks, in effect, is an interpretation that renders the Remonstrators' evidence superfluous—*i.e.*, either the Town provided enough evidence to satisfy the statutory criteria, or it did not, but nothing the Remonstrators might put forward could contradict the sufficiency of the Town's evidence.

The statute nowhere supports giving municipalities a "blank check" with its annexation decisions. To the contrary, by its terms the statute requires courts to enter judgment "according to the evidence that **either** party"—municipality or remonstrator—"may introduce." I.C. § 36-4-3-12(a)(2) (emphasis added). Thus, the statute itself refutes the Town's argument. A trial court assessing the legality of a disputed annexation must weigh and balance the evidence submitted by **both** sides and not put its thumb on the scale for either.

Nor does separation of powers require the kind of deference the Town urges here. This doctrine neither requires judicial review nor forecloses it. Rather, "the judicial role in annexation cases is limited to that prescribed by statute." *Chidester*, 631 N.E.2d at 910 (footnote omitted). In *Rogers*, we explained that Article 3, Section 1 of the Indiana Constitution precludes courts from making "determinations of a non-judicial nature". 688 N.E.2d at 1239 (citing *In re City of Mishawaka*, 259 Ind. 530, 532, 289 N.E.2d 510, 512 (1972)). That much was and remains true. A statute violates separation of powers to the extent it calls for courts to make value judgments based on criteria not judicially administrable. *Id.* In the cited *Mishawaka* case, the trial court found portions of the governing annexation statute unconstitutional. The trial court held that certain statutory requirements— *e.g.*, that annexation must reflect a municipality's "best interests" and be "fair and just"—"were of a non-judicial nature" and thus "in conflict with Art. 3, § 1 of the Indiana Constitution." 259 Ind. at 531-33, 289 N.E.2d at 511, 512-14. Thus, *Rogers*—along with *Mishawaka*—stands for the unremarkable proposition that statutory standards so value-laden that they amount to policy choices are not susceptible to judicial enforcement.

Likewise, *Bradley v. City of New Castle*, 764 N.E.2d 212 (Ind. 2002), does not advance the Town's argument. There, we cautioned courts not to "micromanage" or "scrutiniz[e]" the policy choices reflected in a municipality's annexation decision. *Id*. at 214, 216. We repeat the admonition here. But that does not entitle the Town to kid-gloves treatment on judicial review. For good or ill, the legislature now subjects annexations to judicial review to ensure their legality. A trial court does not fulfill that role simply by taking a municipality's word for it. What the court must follow is the legislature's requirement that municipalities meet

certain criteria before annexation can proceed, not a municipality's claim that the statutory criteria are satisfied on a given evidentiary record. Just as there was no separation-of-powers violation when the legislature gave courts no role in annexation decisions, neither does the legislature violate separation of powers today in charging courts to ensure municipalities meet the statute's requirements. Thus, the judicial role is to decide whether the municipality has met the statutory requirements or flouted them. *Fortville*, 51 N.E.3d at 1197-98. Courts may do no more; but we must do that much.

Next, we consider the statutory annexation requirements and the trial court's merits conclusion that the Town did not satisfy them.

## B. Annexation requirements under Section 13(a)

A municipality's authority to annex territory is defined by statute. Section 13 of the municipal-annexation chapter, I.C. ch. 36-4-3, recites the annexation requirements a municipality must satisfy.

> (a) Except as provided in subsections (e) and (g), at the hearing under section 12 of this chapter, the court shall order a proposed annexation to take place if the following requirements are met:
>
>   (1) The requirements of either subsection (b) or (c).
>
>   (2) The requirements of subsection (d).

I.C. § 36-4-3-13(a). Even if a municipality satisfies these requirements under subsection 13(a), remonstrators can still defeat an annexation if they prove the elements of subsections 13(e) or 13(g). *Id*.

As discussed next, we have no occasion to address subsections 13(e) or 13(g) because we agree with the trial court that the Town did not satisfy its threshold burden to prove it met "[t]he requirements of either subsection [13](b) or (c)." *Id*. § 36-4-3-13(a)(1).

## 1. Subsection 13(b)'s sixty-percent "subdivided" requirement

Although the terminology has changed over the years, "[t]he larger object of the annexation statute is, as it has always been, to permit annexation of adjacent urban territory." *Rogers*, 688 N.E.2d at 1242. Consistent with that goal, subsection 13(b) requires both contiguity between the municipality and the proposed annexation territory and one of three conditions to exist showing the territory is sufficiently urban to warrant annexation—as measured by population density, how much of the territory is subdivided, and how the territory is zoned.

> (b) The requirements of this subsection are met if the evidence establishes the following:
>
> > (1) That the territory sought to be annexed is contiguous to the municipality.
> >
> > (2) One (1) of the following:
> >
> > > (A) The resident population density of the territory sought to be annexed is at least three (3) persons per acre.
> > >
> > > (B) Sixty percent (60%) of the territory is subdivided.
> > >
> > > (C) The territory is zoned for commercial, business, or industrial uses.

*Id*. § 36-4-3-13(b). The Town agrees it cannot meet either the population-density or zoning requirements. So we consider whether the trial court was correct in concluding that the Town failed to prove the territory to be annexed is at least sixty-percent "subdivided".

We begin by noting that the municipal-annexation chapter, I.C. ch. 36-4-3, does not define "subdivided". The legislature has defined some terms that apply throughout Title 36. *Id*. § 36-1-2-1. But "subdivided" is not

among them. Elsewhere in Title 36, "subdivision" is defined, *id*. § 36-7-1-19, but this definition expressly applies only to Title 36, Article 7—concerning planning and development—and not to municipal annexations in Article 4, Chapter 3. "The definitions in IC 36-1-2 and in this chapter apply throughout this article." *Id*. § 36-7-1-1.

The result is that the legislature has left "subdivided" undefined for our purposes. When that happens, we prefer to interpret the term using its "plain, or ordinary and usual, sense." *Id*. § 1-1-4-1(1). And, relevant here, the meaning of a statutory term is a question of law we decide de novo and not a matter on which we will accede to litigants or lower courts. *Nicoson v. State*, 938 N.E.2d 660, 663 (Ind. 2010). When determining a statute's meaning, "we start with the plain language of the statute, giving its words their ordinary meaning and considering the structure of the statute as a whole." *West v. Office of Indiana Sec'y of State*, 54 N.E.3d 349, 353 (Ind. 2016) (citation omitted). We thus reject the Town's plea that we defer to its "authority to make reasonable judgment calls … as to what undefined terms in a governing statute mean."

Merriam-Webster defines "subdivide" as follows:

transitive verb

1 : to divide the parts of into more parts

2 : to divide into several parts
*especially* : to divide (a tract of land) into building lots

intransitive verb

: to separate or become separated into subdivisions

MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/subdivide (last visited June 4, 2019). The two definitions most relevant to the annexation chapter concern dividing a tract of land into building lots and separating land into subdivisions. But these definitions do not illuminate how they are to apply in a given annexation case. A literal definition

makes no sense because **all** land has been divided to some degree. See generally *Johnson v. McIntosh*, 21 U.S. (8 Wheat.) 543, 548, 551-52 (1823) (Marshall, C.J.) (discussing at length divisions of North American territory both before and after European conquest). And we will not embrace a definition that nullifies a legislative requirement. *ESPN, Inc. v. Univ. of Notre Dame Police Dep't*, 62 N.E.3d 1192, 1199 (Ind. 2016). So we look elsewhere within the statute for guidance and observe two things from its context.

First, we note that the sixty-percent "subdivided" requirement must refer to a subdivision that is residential—and not some other zoned use. Recall that subsection 13(b)(2) identifies three alternative tests for satisfying the annexation statute's "urban character" requirement. One option is 13(b)(2)(C), which says the territory is sufficiently urban if "zoned for commercial, business, or industrial uses." It follows that the sixty-percent "subdivided" requirement in 13(b)(2)(B) must refer to a use of the land **other than** commercial, business, or industrial; else, the "subdivided" requirement would be redundant of 13(b)(2)(C). Nor is this requirement referring to divided agricultural land—which would not indicate an "urban character".

Second, the sixty-percent "subdivided" requirement must be referring **only** to a formal residential "subdivision" and not mere residential parcels or tracts of land. Section 8 of the same chapter, which outlines some of the required terms and conditions in an annexation ordinance, distinguishes between territory that is "subdivided" and that which is "parceled" into separate "lots or parcels":

> The territory is subdivided or is parceled through separate ownerships into lots or parcels such that at least sixty percent (60%) of the total number of lots and parcels are not more than one (1) acre.

I.C. § 36-4-3-8(c)(2). This passage notably refers to **both** "subdivided" and "parceled" territory, while subsection 13(b)(2)(B)—the operative provision here—refers **only** to "subdivided" territory. Because the legislature knows how to refer to both kinds of territory but referenced only "subdivided"

territory in 13(b)(2)(B), we infer that these two kinds of territory are distinct, and that the sixty-percent "urban character" requirement refers only to residential territory that is formally "subdivided" and not that which is merely "parceled".

We have not previously defined when land is "subdivided" under Indiana Code section 36-4-3-13(b)(2)(B), and we decline to do so today. But to provide guidance to future litigants and lower courts, we make the following three observations. First, all real property has been subdivided in the broadest sense of the term, so "subdivided" in subsection 13(b)(2)(B) is a narrower term referring only to **formally recorded, residential subdivisions** and not other categories of divided real property. Second, the only permissible unit of measurement is acreage and not the number of parcels or tracts of land. Third, all acreage within the proposed annexation territory must be included in the ratio's denominator, and none should be exempted or excluded.

Unlike the trial court, we are agnostic about whether the legislature should define "subdivided"—a key statutory term, to be sure, in many annexation disputes. That is a matter for the legislature. But until or unless the legislature specifies the term's meaning, courts and communities interested in local annexation issues should proceed with these guideposts in mind.

### a. Trial court's findings not clearly erroneous

As discussed in Part A., we review the trial court's factual findings for clear error and accord its legal conclusions no deference. The findings here are amply supported by the evidence, including testimony of the Remonstrators' expert, and are not clearly erroneous. And we find no error in the court's decision to discount testimony from the Town's expert, who used six different methods for determining whether the annexation area was sixty-percent subdivided. Each method resulted in a different percentage, and his results varied dramatically depending on whether the relevant measuring unit is tracts or acreage. Moreover, of the Town's six methods, only one method considered the urban character of the proposed annexed area. Thus, the other five methods did not answer

whether the annexation territory meets the "urban character" requirement or the statute's overall goal of enabling municipalities to annex adjacent, urban territory. Finally, applying our understanding of "subdivided", explained above, we agree with the trial court that the disputed annexation area does not meet the statutory sixty-percent "subdivided" requirement.

### b. Town's evidence

The Town called an employee within its department of development services as an expert witness. The expert used existing land divisions to develop six different methods for measuring the extent to which the proposed annexation territory is "subdivided". For each method, he made two calculations—one based on the number of parcels or tracts of land; the other based on acreage. He thus produced twelve different percentages—two for each of his six methods for defining "subdivided". He derived the parcels/tracts percentage by calculating the number of subdivided parcels/tracts within the annexed territory (numerator) by the total number of parcels/tracts there (denominator). And he derived the acreage percentage—as the name suggests—by dividing the number of subdivided acres in the annexed territory by the total number of acres. Of the expert's twelve calculations, nine resulted in ratios exceeding the required sixty-percent threshold.

The expert's first method considered only formally recorded subdivision plats and traditional rights of way within the annexation area. Using this method, he concluded that 957 parcels/tracts out of 1,434 parcels/tracts were subdivided (66.74%) and 780 acres out of 4,462 acres are subdivided (17.5%).

His second method considered all recorded subdivision plats, associated rights of way, and metes-and-bounds legal descriptions of properties, except those describing so-called "quarter-quarter" sections, which refer to forty-acre tracts. One square mile is 640 acres. And a "quarter-quarter" section is one-fourth of one-fourth (or one-sixteenth) of a square mile, or forty acres. Using this method, the expert found that 1,326 tracts (92.5%) and 3,440 acres (77.1%) are subdivided.

The third method considered all recorded subdivision plats, associated rights of way, and metes-and-bounds legal descriptions of properties, except those describing so-called "parent" tracts. An example of a parent tract would be the thirty-eight acres of property that remain after a farmer split up his forty-acre field to build a house on two acres. Using this method, the expert found that 1,322 tracts (92.2%) and 1,669 acres (37.4%) are subdivided.

The fourth method considered all recorded subdivision plats, associated rights of way, and metes-and-bounds legal descriptions of properties, except those creating fewer than three portions from a quarter-quarter section. Using this method, the expert found that 1,327 tracts (92.5%) and 3,198 acres (71.7%) are subdivided.

The fifth method considered all recorded subdivision plats, associated rights of way, and metes-and-bounds legal descriptions of properties broken into two or more lots or other divisions of land. Using this method, the expert found that 1,350 tracts (94.1%) and 3,804 acres (85.3%) are subdivided.

And the sixth method considered all recorded subdivision plats, associated rights of way, and metes-and-bounds legal descriptions of properties broken into two or more lots or other divisions of land, but excluding any tract of land larger than twenty acres. Using this method, the expert found that 1,296 tracts (90.3%) and 1,810 acres (40.6%) are subdivided.

The Town's expert acknowledged that some of his calculations included agricultural portions of the annexed territory but did not indicate which methods did so.

### c.  Remonstrators' evidence

The Remonstrators' evidence included a survey by the Indiana Advisory Commission on Intergovernmental Relations showing that more than three-fourths (76.88%) of the annexation area is agricultural. The Remonstrators also presented the expert testimony of the Hendricks County cartographer. The expert compiled a list detailing, by name, the

thirty-six residential subdivisions and nineteen minor residential plats within the annexed territory. Using government records, he recorded the actual acreage for each of these subdivisions and plats and concluded that 782.79 acres of the annexed territory are subdivided—representing 17.54% of the area's total acreage.

### d. Trial court's findings and conclusions

The trial court did not have the benefit of our explanation of "subdivided" when she decided this matter. But her findings and conclusions are largely consistent with the line we have drawn. After hearing evidence at a three-day bench trial and receiving the parties' written submissions, the court entered extensive findings of fact and conclusions of law. The court began by following our guidance in *Rogers* that a municipality's own definition of "subdivision" in a local code pertaining to planning and redevelopment is "one yardstick a **court may** employ", 688 N.E.2d at 1242 (emphasis added), in assessing whether disputed annexation territory is sixty-percent subdivided.

Here, the court looked to Brownburg's and Hendricks County's respective subdivision-control ordinances. These are the local codes that specify the obligations developers must undertake when they build subdivisions within the Town's and County's jurisdiction. The court noted that the Town's ordinance excludes from its definition of "subdivision" any land divided into two or more tracts for an agricultural use. According to the court, that exclusion, combined with the fact that 76.88% of the annexation area is agricultural, leaves just 23.12% of the annexation area available to count toward the sixty-percent "subdivided" requirement.

In addition, the court found that the County ordinance, like the Town ordinance, also is consistent with the statutory purpose of limiting annexation to adjacent **urban** territory. After all, the court observed, the ordinance excluded tracts at least twenty acres in size and land subdivided only for agricultural use.

The court chose to credit testimony of the Remonstrators' expert that the annexation area is 17.54% subdivided. And it concluded, based on the annexation statute, that the "subdivided" requirement is to be measured using total acreage, including agricultural land and large residential tracts/parcels. Thus, the court held, the Town failed to satisfy the sixty-percent "subdivided" requirement of subsection 13(b)(2)(B).

### e. Our analysis

The trial court, the Remonstrators' expert, and the Town's expert's first method, while substantially correct, all embraced a definition of "subdivided" that is likely overinclusive. These experts opined and the trial court found that the "subdivided" area comprised not just the thirty-six residential subdivisions within the annexation territory but also the nineteen minor residential plats there. The record before us is not clear on what qualifies as a minor residential plat. Thus, while we agree with the court's legal conclusion that the Town's proposed annexation territory does not meet the sixty-percent "subdivided" threshold, we also note that the percentage of territory that is subdivided is probably less than the 17.54% found by the trial court (representing 782.79 acres in the numerator and 4,461.98 total acres in the denominator). Though the trial court likely erred by including in the fraction's numerator "parceled" plats, lots, and other residential property that may not be part of a formal subdivision, on this record any such overinclusion is minimal.

## 2. Subsection 13(c)'s "reasonably near future" requirement

Having concluded that the trial court was entitled to find that the proposed annexation territory was not sixty-percent "subdivided", we consider next whether the Town met the alternative requirement under subsection 13(a)(1) that the annexation territory is "needed and can be used by the municipality for its development in the reasonably near future." I.C. § 36-4-3-13(c)(2). The trial court held the Town did not satisfy this requirement. We agree.

Subsection 13(c)(2)'s requirement that the proposed annexation area must be "needed and can be used … in the reasonably near future" includes an essential temporal element. But as with "subdivided", the legislature did not define "reasonably near future". So localities and other interested parties have had to litigate just how soon or remote the prospective development within a proposed annexation area must occur to qualify as "reasonably near future". Although the annexation statute provides few clues, one provision relevant here draws a clear temporal line, in contrast to the statute's otherwise gauzy guidance.

Subsection 15(b) instructs that if a proposed annexation does not satisfy the statute, the municipality cannot annex that territory or any part of it for four years. I.C. § 36-4-3-15(b). Given this clear timeframe, we recognize four years as the time period for assessing the "reasonably near future" requirement under subsection 13(c)(2). In other words, a municipality must prove that it needs and can use the proposed annexation territory for development within four years of enacting the annexation ordinance.

Again, the trial court ruled without the benefit of the clarity we announce today. But her findings and conclusions—that the future development projects the Town identified for the annexation territory will not occur in the reasonably near future—are not clearly erroneous and are consistent with our legal pronouncement.

One such project is the Ronald Reagan Parkway, which was first conceived in the 1980s as an alternative to Raceway Road and State Road 267, and would connect to Interstate 65 in Boone County. Construction on the Reagan Parkway began in 1996 and has continued in phases since then as funding became available. Although portions of the Parkway are complete or currently under construction, planning for the Parkway through the annexation area includes Hendricks and Boone counties but does not include the Town. Even the Town agrees that the timeframe for extending the Parkway past its current terminus within the Town's limits through the annexation area is "[o]ver the next five to fifteen years". And even then, the "timing of construction is not precisely known."

Another future project is the development and construction of a bridge crossing Interstate 74 in the western portion of the annexation area. The

court heard testimony that this project is "targeted for 2026", and the Town itself agrees the project "is still in the planning stages and not scheduled for installation for another nine years".

Other future projects the Town identified include additional residential development and school expansion within the annexation area. But the trial court rejected these, too, finding that neither proposed development is needed and can be used in the reasonably near future. The superintendent of the Brownsburg schools testified that the school corporation owns 111 acres in the annexation area but has "[a]bsolutely … no planned projects whatsoever for that area." The court also heard testimony that twice in recent years housing developers had tried to build on ninety-four acres in the annexation area, but the Town's zoning board rejected the developments because of, among other reasons, drainage problems resulting from heavy clay soil confirmed by the county surveyor.

Finally, the court found that the Town has no plans for a "substantial majority" of the annexation area, and that only "small portions" of the area may be needed and used but not for at least "5 to 15 years in the future."

Based on these findings, the court concluded that the Town did not satisfy the "reasonably near future" requirement of subsection 13(c). As with the sixty-percent subdivided requirement, we hold that the court's findings of fact here are not clearly erroneous, and that the record supports its conclusions of law.

* * *

Because we resolve this case on the ground that the Town did not meet either statutory requirement under subsection 13(a)(1), we need not address other issues the parties raised below, including the contiguity requirements under subsections 13(b)(1) and 13(c)(1) and the fiscal-plan requirements under subsection 13(d).

## C. Remonstrators' cross-appeal

Finally, we reject the Remonstrators' cross-appeal. Remonstrators cannot bring a declaratory-judgment action when their remonstrance and separate request for declaratory relief challenge the same proposed annexation. The legislature has provided a specific statutory procedure for challenging the legality of an annexation. The availability of that avenue of relief forecloses other legal recourse. Cf. *Bradley*, 764 N.E.2d at 217-18 (discussing narrow exceptions to exclusivity of remonstrance procedure not applicable here). Thus, the trial court was correct in dismissing their declaratory-judgment action.

# Conclusion

For these reasons, we affirm the trial court's judgment that the Town did not satisfy its burden of proving it had met the statutory requirements for annexing the disputed territory.

Rush, C.J., and David, Massa, and Goff, JJ., concur.


ATTORNEYS FOR APPELLANTS/CROSS-APPELLEES

Thomas F. Bedsole
Maggie L. Smith
Frost Brown Todd LLC
Indianapolis, Indiana

ATTORNEYS FOR *AMICI CURIAE* ACCELERATE INDIANA MUNICIPALITIES AND INDIANA MUNICIPAL LAWYERS ASSOCIATION, INC.

Kevin S. Smith
Brent R. Borg
Church Church Hittle & Antrim
Fishers, Indiana

ATTORNEY FOR APPELLEES/CROSS-APPELLANTS

Gregory W. Black
Gregory W. Black, P.C.
Plainfield, Indiana