

I N  T H E

# Indiana Supreme Court

Supreme Court Case No. 19S-CC-38

## Rainbow Realty Group, Inc., et al.,

*Appellants/Cross-Appellees,*



FILED

Sep 13 2019, 11:08 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

—v—

## Katrina Carter and Quentin Lintner,

*Appellees/Cross-Appellants.*

---

Argued: March 7, 2019 | Decided: September 13, 2019

Appeal from the Marion Superior Court, No. 49D14-1505-CC-16629
The Honorable James B. Osborn, Judge

On Petition to Transfer from the Indiana Court of Appeals,
No. 49A02-1707-CC-1473

---

**Opinion by Justice Slaughter**

Chief Justice Rush and Justices David, Massa, and Goff concur.

**Slaughter, Justice.**

We hold that the parties' "rent-to-buy" agreement is not a land-sale contract but a rental agreement subject to Indiana's residential landlord-tenant statutes. Plaintiffs, which own and manage the properties held in inventory, are "landlords" that violated the Statutes by delivering the disputed property in an uninhabitable condition. We affirm the trial court's judgment for the tenants and against Plaintiffs on their claim under the Statutes. On the other counts, we affirm in part, reverse in part, and remand.

# Factual and Procedural Background

## A. Rent-to-buy agreement for uninhabitable house

Plaintiff Cress Trust owns houses in Marion County. Plaintiff Rainbow Realty Group, Inc., sells, rents, and manages these properties for Cress. The same individual serves both as president of Rainbow and as Cress's corporate trustee. Throughout this Opinion, we refer to "Plaintiffs" to denote these related parties collectively and refer to Cress and Rainbow separately as warranted to identify one party but not the other.

Plaintiffs offer four options to customers interested in their housing stock:

- straight sale;
- straight rental;
- land contract; or
- rent-to-buy contract.

A straight sale requires payment of the full purchase price in exchange for legal title. A straight rental offers a house in a habitable condition in exchange for monthly payments. A land contract requires a large down payment followed by monthly payments to finance the sale. And a rent-to-buy is not currently habitable and involves a lesser monthly payment than a straight rental.

Katrina Carter and Quentin Lintner are a married couple living in Marion County. In response to an ad, the Couple contacted Plaintiffs to learn about housing options. Although Plaintiffs considered the Couple to have a poor credit history and told them their rental stock was not available, Plaintiffs concluded the Couple's $4,000 monthly income could qualify them for Plaintiffs' rent-to-buy program. The Couple applied and paid a $100 deposit to hold a single-family house on North Oakland Avenue in Indianapolis with a purchase price of $37,546. In May 2013, after their application was approved, the Couple signed a "Purchase Agreement (Rent to Buy Agreement)". Attachments to the Agreement included a separate declaration, a truth-in-lending disclosure, and a residential real-estate disclosure.

Under the Agreement, Plaintiffs and the Couple agreed that the House "shall be used as a single-family private residence and for no other purpose whatsoever". The Couple agreed they were acquiring the House "as is", that it was not in livable condition, and that they would need to make it habitable before they could live in it. In addition, the Agreement said the House came with no warranties of condition or habitability, that the Couple would have to make or pay for any repairs themselves, that any improvements to the House would become a permanent part of the property, that payment was due on the first of the month, and that Plaintiffs could "evict" them for not paying on time.

When the Couple signed the Agreement, the House was missing toilets, plumbing, electrical wiring, and door locks. All the windows were broken. There was no security to prevent break-ins. The basement stairs were in disrepair. The carpets were beyond repair. The property was strewn with trash. And animals had infested the property.

The Agreement, which said the parties' intent was to consummate a sale of the House, required the Couple to make monthly payments of $549 for thirty years at an interest rate of 16.3 percent. Despite the stated intent and thirty-year payment term, the Agreement said that the first twenty-four payments were "rental payments". If the Couple made those payments, the parties would execute a separate "Conditional Sales Contract (Land Sale)" for the remaining twenty-eight years.

In a separate contract, Plaintiffs agreed to make electrical and plumbing repairs for a charge. Yet by 2015, two years after the Couple entered the Agreement with Plaintiffs, the House remained uninhabitable. Electrical wiring remained exposed throughout the House. More than half of the electrical outlets didn't work. All but five exterior windows were broken, and only two of the windows opened. Most of the House had no flooring, only plywood, and broken tiles in the kitchen exposed rusty nails sticking up through the floor. Walls in the kitchen and dining room had water damage, as did the basement. The rotted backdoor was not secure.

Even after executing the Agreement, the Couple continued to live in a motel for an unspecified period, during which they paid the motel bill and made their monthly House payment. Despite the House's unlivable condition, the Couple used it as a home, residence, or sleeping unit during part of the time relevant to this litigation.

## B. Litigation

The House proved more costly than the Couple could afford. When they fell behind in their payments, Plaintiffs tried to evict them. The Plaintiffs first filed suit in small-claims court in July 2013. The Couple avoided eviction by agreeing to raise their payments from $549 per month to $200 per week until the arrearage was satisfied. Plaintiffs filed a second eviction in November 2014. This time, the Couple avoided eviction by agreeing to raise their payments to $250 per week until the arrearage was erased. In March 2015, Plaintiffs filed a third eviction. This case resulted in a small-claims-court order allowing Plaintiffs to retake possession, but the Couple appealed that order to the Marion Superior Court.

In the trial court, Plaintiffs sought possession, damages, and attorney's fees, plus various costs to clean and "re-rent" the property—a total claim of $19,727.30. The Couple answered and asserted various counterclaims, including fraud, breach of contract, and failure to meet landlord obligations under Indiana's residential landlord-tenant statutes. While the matter was pending, the Couple vacated the house, thus mooting Plaintiffs' possession claim. The court entered partial summary judgment for the Couple, finding Plaintiffs liable on their counterclaims for breach

of the warranty of habitability and for making false or deceptive statements about Plaintiffs' ability to disclaim the warranty and other obligations. The trial court later held a bench trial on the remaining issues. It reaffirmed its prior ruling that the Agreement was unlawful and unenforceable. It awarded the Couple $1,000 in compensatory damages for Plaintiffs' willful deception and $3,000 in punitive damages. The court rejected the Couple's request for $35,000 in attorney's fees, concluding that amount was "unreasonable", and reduced the fee award to $3,000. Plaintiffs appealed the adverse judgment, and the Couple filed a cross-appeal on the issue of attorney's fees.

The court of appeals reversed, concluding the Agreement is not a residential lease and thus not subject to the Statutes. For this reason, the court also reversed the judgment below that Plaintiffs committed fraud and reversed the trial court's award of attorney's fees because the Couple was no longer a prevailing party. *Rainbow Realty Group, Inc. v. Carter*, 112 N.E.3d 716, 726 (Ind. Ct. App. 2018). We granted transfer, thus vacating the appellate opinion, and now affirm in part, reverse in part, and remand.

# Discussion and Decision

## A. Residential landlord-tenant statutes

We hold that the parties' Agreement is subject to the protections afforded by the residential landlord-tenant statutes. Ind. Code art. 32-31 (2012). First, their Agreement—a purported rent-to-buy contract—is a residential lease and not a land-sale contract, so it is not exempt from the Statutes' coverage on this basis. Second, the Agreement is a rental agreement for a "dwelling unit" under the Statutes, so Plaintiffs had to deliver the House in a safe, clean, and habitable condition—which they did not do.

## 1. Not a land-sale contract

We begin by considering Plaintiffs' threshold argument that the Agreement qualifies as a "contract of sale" exempt from the Statutes. "The residential landlord-tenant statutes do not apply to any of the following arrangements … : [o]ccupancy under a contract of sale of a rental unit … if the occupant is the purchaser". I.C. § 32-31-2.9-4(2). According to Plaintiffs, the Agreement is exempt from the Statutes because it is a contract of sale, and the Couple occupied the House as purchasers in interest.

Plaintiffs emphasize that the Agreement contains several indicia of a purchase. The purchase-agreement declaration explains the difference between renting and buying, and the Couple indicated they were buying: "My intent is to the purchase the property at …  N. Oakland Av., Indianapolis[.] I am not renting the property." The Couple's declaration continues with each of them agreeing to the following terms: "I wish to save money by repairing & maintaining the property myself. I do not expect the property owner to make any repairs to the property and fully understand that I am buying the property 'as-is' with out [sic] any warranty of habitability." In addition, the Agreement recites the sale price, the interest rate, and the term, and the Agreement requires the Couple to maintain the House, pay real-estate taxes, and obtain homeowners insurance.

Although the Agreement describes the first twenty-four payments as "rent", Plaintiffs say those were not payments for **using** the House but were "amortized payments of principal and interest which were credited toward the purchase price in the land sales contract." Again, Plaintiffs point to the declaration, in which the Couple agreed, "I am not renting the property. All payments shall apply to the principal and interest shown on the amortization schedule provided at closing." According to Plaintiffs, this financing condition relieved the Couple of having to make an immediate down payment, which they could not afford, and permitted them instead to substitute its equivalent payable over twenty-four months.

We agree with Plaintiffs that most of the transaction's terms and formal structure suggest this was a sale—albeit unorthodox—necessitated by the Couple's inability to afford a down payment for the House. But the transaction's purported form and assigned label do not control its legal status. For at least the first two years, the Agreement was a residential lease with a contingent commitment to sell.

Plaintiffs' designated evidence reflected the rent-to-buy program's structure as a lease and then (maybe) a sale. In an affidavit, Rainbow's president explained that the program consisted of "a lease for 2 years with the right to convert the lease to a Land Contract after successful completion of the 2 year lease." If the purported rent-to-buy agreement were really a purchase agreement, as Plaintiffs contend, the Couple would have become homeowners with "all incidents of ownership" and with "equitable title [vesting in the Couple] at the time the contract is consummated"—and, in most cases, would not be subject to residential eviction in a small-claims court. *Skendzel v. Marshall*, 261 Ind. 226, 234, 240-41, 301 N.E.2d 641, 646, 650 (1973). Here, the Agreement required a separate contract to effectuate a sale. No equity accrued or accumulated during the first twenty-four months. If the Couple defaulted before executing the subsequent "Land Contract", or if they failed to make payments or to close this latter transaction, they were subject to eviction and forfeiture of all payments made. Of course, that is precisely what happened.

During the Agreement's twenty-four-month term, Plaintiffs reserved for themselves a landlord's prerogative to enter the premises, restricted the Couple's use of the land, and, upon the Couple's default, evicted them as if they were tenants and kept their "rental payments". These features, taken together, are particular to a residential lease. Thus, the parties' Agreement—a purported rent-to-buy contract—is not a "contract of sale of a rental unit" and thus is not exempt from the Statutes' coverage under Section 32-31-2.9-4(2).

## 2. "Rental agreement" for a "dwelling unit"

Having held the Agreement was not a "contract for sale", we next consider whether it is subject to the residential landlord-tenant statutes. The Statutes apply to "dwelling units that are let for rent under a rental agreement". I.C. § 32-31-8-1(a). Thus, the two issues here are (i) whether the House is a "dwelling unit" and (ii) whether the parties' Agreement is a "rental agreement". As discussed next, we hold that both statutory requirements are satisfied, thus subjecting the parties' relationship to the residential landlord-tenant statutes, including the obligation to deliver the premises in a "safe, clean, and habitable condition." *Id*. § 32-31-8-5(1).

### a. "Dwelling unit"

The term "dwelling unit" appears throughout Indiana Code article 32-31, and at times as a term of art that the Code defines on three separate occasions—in Chapters 5, 6 and 9. *Id*. §§ 32-31-5-3, 32-31-6-1, 32-31-9-5. The term, however, is not defined in Chapter 8—the operative chapter—which both imposes the requirement of habitability and instructs that a purported waiver of this requirement is void. *Id*. §§ 32-31-8-4, 32-31-8-5.

We resist the temptation to import into Chapter 8 the definition of "dwelling unit" that the legislature used elsewhere in Article 32-31. The legislature knows how to apply a statutory definition broadly. Examples abound of the legislature's applying a definition throughout the entire code, see *id*. § 1-1-4-5(a), as well as throughout a title, article, or chapter. The legislature could likewise have done that here. But it did not. To the contrary, Section 32-31-5-3 specifically limits the definition to "this chapter", referring to Chapter 5. It applies Chapter 5's definition in Chapter 6. *Id*. § 32-31-6-1. And it repeats the same definition in Chapter 9, stating that "dwelling unit" there "has the meaning set forth in [Chapter 5]." *Id*. § 32-31-9-5. From the legislature's noteworthy failure to adopt the same definition for Chapter 8, we infer it did not intend that definition to apply there—thus prompting the question: what does "dwelling unit" mean in Chapter 8?

The answer lies in the dictionary definition of the undefined statutory term. As we explained in *Town of Brownsburg v. Fight Against Brownsburg Annexation*, 124 N.E.3d 597 (Ind. 2019), when a statutory term is undefined, the legislature directs us to interpret the term using its "plain, or ordinary and usual, sense." *Id*. at 605 (quoting I.C. § 1-1-4-1(1)). We generally avoid legal or other specialized dictionaries for such purposes and turn instead to general-language dictionaries. Merriam-Webster defines a "dwelling" as "a shelter (such as a house) in which people live". Merriam-Webster, https://www.merriam-webster.com/dictionary/dwelling (last visited Sept. 13, 2019). Similarly, the American Heritage defines "dwelling" as "[a] place to live in; an abode". The American Heritage Dictionary, https://ahdictionary.com/word/search.html?q=dwelling (last visited Sept. 13, 2019).

Until the legislature tells us otherwise, we adopt these definitions of "dwelling" and understand a Chapter 8 "dwelling unit" to refer to a place to live, whether the structure is freestanding or an individual room, apartment, or other unit within a larger structure consisting of multiple units. Applying that definition here, we hold that the House is a "dwelling unit" under Indiana Code chapter 32-31-8 because a single-family house is quintessentially a place to live.

### b. "Rental agreement"

Having concluded the House is a dwelling unit, we next consider whether Chapter 8 applies to this dwelling unit. As mentioned, the Statutes apply only to "dwelling units that are let for rent under a rental agreement". I.C. § 32-31-8-1. Unlike "dwelling unit", Chapter 8 defines "rental agreement". It incorporates the definitions in Chapter 3. *Id*. § 32-31-8-2. And Chapter 3 defines "rental agreement" as "an agreement together with any modifications, embodying the terms and conditions concerning the use and occupancy of a rental unit." *Id*. § 32-31-3-7. Whether the parties' Agreement is a "rental agreement" turns on whether the House is a "rental unit".

We conclude that the Agreement was a rental agreement because Plaintiffs and the Couple agreed that the House was promised for the

Couple's use as a single-family dwelling. Because the House is a "dwelling unit" and the Agreement qualifies as a "rental agreement", Plaintiffs' attempted waiver of their obligations as landlords is void.

### i. "Rental unit"

"Rental unit", also a defined term, means:

(1) a structure, or the part of a structure, that is used as a home, residence, or sleeping unit by:
    (A) one (1) individual who maintains a household; or
    (B)  two (2) or more individuals who maintain a common household; or
(2) any grounds, facilities, or area promised for the use of a residential tenant, including the following:
    (A) An apartment unit.
    (B)  A boarding house.
    (C)  A rooming house.
    (D) A mobile home space.
    (E)  A single or two (2) family dwelling.

*Id*. § 32-31-3-8. This definition from Chapter 3 likewise applies to Chapter 8. *Id*. § 32-31-8-2.

The parties devote considerable time debating the applicability of Section 32-31-3-8(1) above. The Couple say they actually "used" the House as a "home, residence, or sleeping unit", regardless of whether it was habitable or whether the Agreement authorized them to do so, thus satisfying the definition of a "rental unit" under Subsection (1): "a structure … that **is used** as a home, residence or sleeping unit by … two (2) or more individuals who maintain a common household". *Id*. § 32-31-3-8(1)(B) (emphasis added).

Plaintiffs respond that how space is "used" should not dictate its legal status under the Statutes. Otherwise, Plaintiffs say, a contract for space intended for non-residential use—such as a storage unit, which often lacks plumbing and heating and thus is uninhabitable by any measure—would be transformed into a residential "rental unit", and thus accorded the full

panoply of legal rights accorded such premises, merely by the lessee's unauthorized, unilateral action of moving in and taking up residence. There is much practical wisdom in Plaintiffs' concern. For that reason, we decline the Couple's invitation to rely on Section 8(1) for the conclusion that the House is a "rental unit" under the Statutes.

Section 8(2), however, resolves Plaintiffs' concern. A unit's legal status is governed not by the unilateral action of its lessee but by its "promised" use by the owner—"any grounds, facilities, or area **promised** for the use of a residential tenant". *Id*. § 32-31-3-8(2) (emphasis added). In other words, a unit is not a "rental unit" under the Statutes unless the owner contemplates—has "promised"—its use for a residential purpose. Thus, what matters under Subsection (2) is not whether the contracted unit is presently uninhabitable but whether the parties, including the owner, intend the unit for a residential use. The House clearly fills that bill. Unlike a storage unit, the House was promised for—and, in fact, contractually limited to—use as "a single-family private residence and for no other purpose whatsoever" in which only the Couple could live. But this promised-for use does not end the inquiry. A "rental unit" under Section 8(2) requires not only a residential use but the use of that unit by a residential "tenant".

### ii. "Tenant"

The term "tenant" is defined in Chapter 3 as "an individual who occupies a rental unit: (1) for residential purposes; (2) with the landlord's consent; and (3) for consideration that is agreed upon by both parties." *Id*. § 32-31-3-10. And, relevant here, this definition applies to Chapter 8. *Id*. § 32-31-8-2. The Statutes do not define "occupy", so again we turn to general-language dictionaries. The American Heritage says "occupy" means, among other things, "[t]o dwell or reside in (an apartment for example)". The American Heritage Dictionary, https://ahdictionary.com/word /search.html?q=occupy (last visited Sept. 13, 2019). Merriam-Webster says the definition of "occupy" includes "to take or hold possession or control of" and "to reside in as an owner or tenant". Merriam-Webster, https://www. merriam-webster.com/dictionary/occupy (last visited Sept. 13, 2019). We adopt

these definitions and interpret "occupy" here to mean possess, control, dwell, or reside. Thus, the Couple "occupied" the House from day one because they possessed it and had access to it, although they did not initially live in it.

In addition, the Couple's occupancy was with the consent of Plaintiffs—each one a "landlord" under the statutory definition: Cress was the "owner" of the House, *id*. § 32-31-3-3(1), and Rainbow was the property manager that, among other things, collected the rent, *id*. § 32-31-3-3(2). The Couple's occupancy was for the monthly consideration specified in the parties' Agreement—and, later, after missing several payments, the Couple agreed to increased payments to avoid being evicted. The Agreement also required that the Couple use the House as a single-family private residence—clearly contemplating an occupancy for "residential purposes".

### 3. Summary

Based on our conclusions above, we hold that the Couple are tenants of a dwelling unit that is the subject of a rental agreement governed by the residential landlord-tenant statutes. Under these Statutes, Plaintiffs were required to deliver the House to the Couple in a habitable condition, *id*. § 32-31-8-5(1), which they did not do. The Statutes also render the Agreement's purported waiver of their obligation as void. *Id*. § 32-31-8-4. Thus, the trial court was correct in finding that Plaintiffs breached the statutory warranty of habitability.

*       *       *

If this case were simply about the parties' freedom of contract, the Couple would have no legal recourse. Plaintiffs disclaimed the warranty of habitability, informed the Couple that the House required significant renovation, and forbade them from taking up residence there before it was habitable. The Couple agreed to these terms but soon thereafter violated them. Were it not for the governing Statutes, Plaintiffs would be entitled to relief against the Couple for having breached their Agreement. But the Statutes are not about vindicating parties' freely bargained agreements.

They are, rather, about protecting people from their own choices when the subject is residential property and their contract bears enough markers of a residential lease. Unless a statute is unconstitutional, the legislature is entitled to enact its policy choices. The disputed statutes at issue here reflect those choices.

## B. Deceptive consumer sales act

Next, we address the Couple's claim under Indiana's Deceptive Consumer Sales Act. Ind. Code ch. 24-5-0.5 (2012). The trial court found for the Couple, concluding that Plaintiffs "intentionally deceiv[ed] the [Couple] as to the nature of the Purchase Agreement" by making "false or deceptive statements about the ability to disclaim the warranty of habitability and obligations associated with said warranty." The court awarded the Couple $1,000 in compensatory damages and $3,000 in punitive damages. The court of appeals reversed the trial court on this claim, based on its determination that the Agreement was not a lease and thus wasn't subject to the Statute, especially its warranty of habitability. 112 N.E.3d at 725. As discussed, we have vacated the court of appeals' opinion and hold that the Agreement is subject to the residential landlord-tenant statutes. But that does not mean we are reinstating the trial court's award for the Couple under the Act. We still find their claim to be without merit, and thus reverse the trial court on this claim, for three reasons.

First, Plaintiffs did not know, or have reason to know, that their allegedly deceptive act was false. The Couple premised their deception claim on Section 3(a)(8) of the Act, which defines a deceptive act to include a representation "[t]hat [a] consumer transaction involves or does not involve a warranty, a disclaimer of warranties, or other rights, remedies, or obligations, if the representation is false and if the supplier knows or should reasonably know that the representation is false." I.C. § 24-5-0.5-3(a)(8). The dispute here concerns Plaintiffs' representation that they had no legal obligation to warrant the House's habitability. Whether the parties were entitled to disclaim the warranty is a legal question that we have now resolved in favor of the Couple and against Plaintiffs. But just because Plaintiffs turned out to be wrong does not mean they knew or

had reason to know they were wrong, thus rendering their representation false and subjecting them to liability under the Act. Neither litigants nor their lawyers are prescient. And neither, as we have seen, are appellate judges. Recall that three respected judges on our court of appeals all shared Plaintiffs' view of this case and held the Statutes did not apply. Just as we would not charge our appellate-court colleagues with deception, neither is that an appropriate charge against Plaintiffs, which made plausible, non-frivolous arguments in support of their view that the Statutes did not apply. Though we ultimately disagree with that view, we reject the trial court's conclusion that Plaintiffs' contrary position—and their statements reflecting that position—were somehow deceptive. A broader lesson is that statements of law—as opposed to statements of fact—are seldom actionable, especially on matters for which the legal question is unsettled or unresolved.

Second, even assuming for argument's sake that Plaintiffs' disclaimer of the warranty qualified as a deceptive act that Plaintiffs knew or should have known was false, the Couple still would not be entitled to damages under the Act. A prerequisite for obtaining damages is that the claimant relied on the deception. "A person relying upon an uncured or incurable deceptive act may bring an action for the damages actually suffered as a consumer as a result of the deceptive act or five hundred dollars ($500), whichever is greater." *Id*. § 24-5-0.5-4(a). On this record, the trial court did not find that the Couple relied on Plaintiffs' disclaimer of the warranty. Thus, the trial court's award of compensatory and punitive damages under the Act cannot stand.

Third, a final reason for reversing the trial court's award is that the Act does not contemplate an aggrieved person suing for damages when the alleged deception concerns real property. Subsection 4(a) of the Act, which authorizes a person who relies on a deceptive act to sue for damages, expressly "does not apply to a consumer transaction in real property". *Id*. § 24-5-0.5-4(a). This real-property limitation has two exceptions—for time-share purchases and camping-club memberships—that do not apply here. *Id*.

## C. Attorneys' fees

Finally, we consider the trial court's award of attorney's fees. Prevailing parties under the residential landlord-tenant statutes are eligible to recoup their fees. An award of fees, however, is discretionary. "If the tenant is the prevailing party in an action under this section, the tenant **may** obtain any of the following, if appropriate under the circumstances: . . . Attorney's fees and court costs." I.C. § 32-31-8-6(d)(1)(B) (emphasis added).

The Couple sought fees of $35,475, based on 129 hours of lawyer time over two years at an hourly rate of $275. The trial court found that fees were warranted but reduced the award to $3,000, concluding that the full amount sought was "unreasonable" in light of "the typical rates charged in Marion County, the complexity of this case, the amount of motions practice involved and the amount of time spent in court and in preparation of proposed findings." The court did not specify what it believed a reasonable hourly rate, or range of rates, would be in Marion County. And neither did it say how many hours of lawyer time would be reasonable for this lawsuit.

On this record, neither the Couple's proposed hourly rate nor the number of hours they expended strike us as so obviously excessive that their unreasonableness speaks for itself. Thus, the trial court needed to support its fee award with findings explaining its nearly ninety-two-percent reduction in the fees requested. Its failure to do so requires that we vacate the award and remand so the court can supply these omitted details.

In assessing what qualifies as a reasonable fee, trial courts have broad discretion in determining a fee award and may consider several factors. See, e.g., *Masters v. Masters*, 43 N.E.3d 570, 576 (Ind. 2015). A court's exercise of discretion to award fees should be supported by appropriate findings. On remand, the court may wish to consider the following items—though we note this list is neither exhaustive nor required. The Couple did not sue Plaintiffs; Plaintiffs sued them and sought to recover $19,727.30 in damages, costs, and fees. The Couple succeeded in resisting Plaintiffs' claim for a monetary award. The Couple asserted their own counterclaims, but not all of them succeeded; and not all of them would

have entitled the Couple to a fee award even if they had succeeded. In addition, it may be relevant to consider Plaintiffs' fees. The Couple's fees of $35,000 would seem more reasonable if, for example, Plaintiffs had spent $50,000 to litigate this case than if they had spent $5,000. But not even that kind of disparity would necessarily be dispositive. Regardless of each party's fees, the fact remains that the Couple won the lawsuit's main event—a judicial determination that the Agreement's purported waiver of Plaintiffs' obligation as landlords is void and unenforceable under the Statutes—and Plaintiffs lost.

On remand, if the Couple elect to seek their appellate fees, the trial court may elect to consider any such request using the same reasonableness criteria we have outlined here in connection with their request for fees incurred in the trial court.

## Conclusion

For these reasons, we affirm the trial court's judgment for the Couple and against Plaintiffs under the residential landlord-tenant statutes. We reverse the judgment awarding relief to the Couple under the deceptive consumer sales act and remand with instructions to enter judgment for Plaintiffs. We affirm the trial court's resolution of the remaining claims and counterclaims. And we remand with instructions to recalculate the Couple's award of reasonable attorney's fees, including appellate fees they may seek.

Rush, C.J., and David, Massa, and Goff, JJ., concur.

ATTORNEYS FOR APPELLANTS/CROSS-APPELLEES

Karl L. Mulvaney
Nana Quay-Smith
Bingham Greenebaum Doll LLP
Indianapolis, Indiana

ATTORNEYS FOR APPELLEES/CROSS-APPELLANTS

Jon Laramore
Cheryl Koch-Martinez
Adam Mueller
Indiana Legal Services, Inc.
Indianapolis, Indiana

John E. Brengle
Indiana Legal Services, Inc.
New Albany, Indiana

ATTORNEYS FOR *AMICUS CURIAE* STATE OF INDIANA

Curtis T. Hill, Jr.
Attorney General of Indiana

Thomas M. Fisher
Solicitor General of Indiana
Indianapolis, Indiana

Justin G. Hazlett
Section Chief, Consumer Litigation
Indianapolis, Indiana

Steven P. Frank
Michelle Alyea
Amanda Lee
Lara Langeneckert
Julia C. Payne
Deputy Attorneys General
Indianapolis, Indiana

ATTORNEYS FOR *AMICI CURIAE* CONSOLIDATED CITY OF
INDIANAPOLIS AND MARION COUNTY

Donald E. Morgan
Office of Corporation Counsel
Indianapolis, Indiana

Maggie L. Smith
Darren A. Craig
Frost Brown Todd LLC
Indianapolis, Indiana

ATTORNEYS FOR *AMICUS CURIAE* INDIANA ASSOCIATION FOR
COMMUNITY ECONOMIC DEVELOPMENT INC. d/b/a
PROSPERITY INDIANA

Maggie L. Smith
Darren A. Craig
Frost Brown Todd LLC
Indianapolis, Indiana

ATTORNEYS FOR *AMICUS CURIAE* NEIGHBORHOOD CHRISTIAN
LEGAL CLINIC

Maggie L. Smith
Darren A. Craig
Frost Brown Todd LLC
Indianapolis, Indiana

Chase M. Haller
Neighborhood Christian Legal Clinic
Indianapolis, Indiana

ATTORNEY FOR *AMICI CURIAE* NOTRE DAME CLINICAL LAW
CENTER, AND NATIONAL CONSUMER LAW CENTER

Judith Fox
Notre Dame Clinical Law Center
South Bend, Indiana

ATTORNEY FOR *AMICUS CURIAE* FAIR HOUSING CENTER OF CENTRAL INDIANA

James Strenski
Cantrell, Strenski & Mehringer, LLP
Indianapolis, Indiana