

IN THE

# Court of Appeals of Indiana

City of Bloomington, Monroe County, Indiana, et al.,

*Appellants-Respondents*

v.

County Residents Against Annexation, Inc., et al.,

*Appellees-Petitioners*



FILED

Sep 24 2025, 8:49 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

September 24, 2025

Court of Appeals Case No.
24A-PL-1967

Appeal from the Monroe Circuit Court

The Honorable Nathan G. Nikirk, Special Judge

Trial Court Cause No.
53C06-2203-PL-509

**Opinion by Judge Weissmann**
Judges Bailey and Brown concur.

**Weissmann, Judge.**

[1] The City of Bloomington (City) attempted to annex seven adjacent areas. This appeal involves two of those areas—Area 1A and Area 1B—in which more than half of the property owners opposed the annexation and filed suit to stop it. After a lengthy bench trial, the trial court determined that the annexations of Areas 1A and 1B could not proceed because the statutory requirements for annexation were not met. City appeals, claiming the trial court misconstrued those requirements and the annexation should go forward. We find no such misconstruction and affirm the trial court's judgment halting the annexation.[1]

## Facts

[2] This case has a protracted and complicated background strewn with lawsuits, special legislation, and related appeals, one of which remains pending in our Supreme Court.

### *Original Waiver Agreements*

[3] More than a half century ago, City began providing sewage services to landowners outside City's boundaries in exchange for their agreements to waive their rights to remonstrate against future annexation by City. Many of these waivers were not contemporaneously recorded. These waivers might have

---

[1] We conducted oral argument in our courtroom on August 19, 2025. We thank the parties for their able presentations, which were helpful in our resolution of this appeal.

prevented many landowners in Areas 1A and 1B from opposing annexation had the legislature not intervened.

## *Legislative Action (2017-2020)*

In February 2017, after a 12-year hiatus from City's annexation efforts and with a new mayor in office, City proposed annexing seven adjacent areas. The legislature immediately enacted special legislation—Indiana Code § 36-4-3-11.8 (2017 Blocking Statute)—essentially "cut[ting] off [City's] proposed annexation and prohibit[ing City] from trying to annex the same areas for the next five years." *Holcomb v. City of Bloomington*, 158 N.E.3d 1250, 1254 (Ind. 2020).

In 2019, while the 2017 Blocking Statute was still in effect, the General Assembly went further. Through the amendment of Indiana Code § 13-18-15-2 (2019 Voiding Statute), the General Assembly retroactively voided certain remonstration waivers including most of those obtained by City over the years. Without invalidating any annexations that took effect on or before July 1, 2019, this legislation specified that:

- waivers executed before July 1, 2003, were void.

- waivers executed after June 30, 2003, and before July 1, 2019, were void unless recorded before January 1, 2020.

- all waivers would expire 15 years after execution if not voided before that.

Ind. Code § 13-18-15-2(e)-(g).

[6] The 2019 Voiding Statute dramatically pruned the landscape of City's annexation efforts. Eighty percent of the remonstrance waivers executed in the seven annexation areas were invalidated by the legislation. *City of Bloomington v. Smith*, 252 N.E.3d 951, 957 (Ind. Ct. App. 2025), *trans. pending*. The number of valid remonstrances is critical to any annexation effort. Under Indiana Code § 36-4-3-11.3(b)(1), an annexation ordinance is void if 65% or more of the qualified landowners in that territory signed a valid remonstration petition. But if at least 51% but less than 65% of the qualified landowners signed a valid remonstration petition, the annexation is not void but would be subject to judicial review to determine its validity. Ind. Code § 36-4-3-11.3(c).

[7] Had the waivers in this case remained valid, City's annexation of five of the seven areas—including Areas 1A and 1B—would have taken effect as planned with inadequate remonstrances to stop it, and the remaining two areas would have been subject to judicial review. *Smith,* 252 N.E.3d at 958. After the 2019 Voiding Statute took effect, however, the proposed annexations of Areas 1A and 1B were subject to judicial review, and the annexations of the remaining five areas were void. *Id.*

### The 2021 Annexation and Remonstration Results

[8] In late 2020, our Supreme Court struck down the 2017 Blocking Statute as unconstitutional special legislation. *Holcomb*, 158 N.E.3d at 1265. This meant City's attempt at annexation could proceed, though the 2019 Voiding Statute remained in effect, potentially limiting City's efforts.

[9] City adopted new annexation ordinances in September 2021 for all seven proposed annexation areas. The boundaries for Areas 1A and 1B in the 2021 ordinances were identical to those in the 2017 ordinances, despite the significant changes wrought by the 2019 Voiding Statute.[2]

[10] The majority of property owners in Areas 1A and 1B opposed City's newest annexation effort and signed remonstration petitions. The Monroe County Auditor certified that valid annexation remonstrance petitions were filed by nearly 61% of the landowners in Area 1A and by 57.5% of the landowners in Area 1B. The Auditor included in that count remonstrators who had previously signed remonstration waivers that were invalidated by the 2019 Voiding Statute. These percentages were sufficient to subject the annexations of Areas 1A and 1B to judicial review.[3] Thereafter, an organization representing many of these remonstrators—County Residents Against Annexation (CRAA)—filed its *Petition for Appeal of Annexation, for Declaratory Judgment, and for Damages* challenging the attempted annexations of Areas 1A and 1B.

### Bifurcated Legal Battle (2022-Present)

[11] In 2022, City sued to invalidate the 2019 Voiding Statute as unconstitutional, alleging the statute substantially impaired City's contracts in violation of the

---

[2] At oral argument, City's counsel stated that City could not draw the boundaries differently and still accomplish the annexation of the seven areas, given various limitations in the applicable annexation statutes.

[3] The other five areas that City sought to annex produced even greater opposition—more than 65% signed remonstration petitions, rendering the attempted annexations of those areas void if the 2019 Voiding Statute remained in effect. *See* Ind. Code § 36-4-3-11.3(b)(1).

Contract Clauses of the federal and state constitutions. *See* U.S. Const. Art. 1, § 10; Ind. Const. art. 1, § 24. The State intervened to defend the 2019 Voiding Statute.

[12] Within this Contract Clause litigation, City successfully sought voluntary dismissal with prejudice of its claims as to Areas 1A and 1B. City's apparent intent was to essentially allow the remonstrators in those areas to seek judicial review—in other words, to proceed with the normal annexation process in Areas 1A and 1B while allowing the constitutional challenge to the 2019 Voiding Statute to continue making its way separately through the courts as to the remaining five annexation areas.[4]

[13] After this partial dismissal, judicial review of the proposed annexations in Areas 1A and 1B proceeded. The trial court, with a special judge presiding, conducted a five-day bench trial on CRAA's *Petition for Appeal of Annexation, for Declaratory Judgment, and for Damages*. The parties introduced extensive documentary evidence and testimony from experts, present and former local officials, and property owners within Areas 1A and 1B. Months later, on August 7, 2024, the court issued its 47-page *Findings of Fact and Conclusions of Law* (Judgment) finding neither Area 1A nor Area 1B met the statutory requirements for

---

[4] After this voluntary dismissal of City's claims involving Areas 1A and 1B, the trial court ultimately rejected City's Contract Clause claims and entered partial summary judgment against City. City appealed, and this Court affirmed the trial court's ruling earlier this year. *Smith*, 252 N.E.3d at 965-66. Although City's petition to transfer in that appeal remains pending, our Supreme Court has scheduled oral argument for October 30, 2025.

annexation, thus ending City's latest effort to annex those two areas. City appeals.

## Discussion and Decision

[14] City raises two primary issues on appeal. First, City claims that the trial court reached the wrong result because it erroneously interpreted the statutory requirements for annexation. City argues that the trial court's interpretation essentially renders annexation of a mixed residential and commercial/business/industrial (CBI) zoned area impossible because such an area cannot meet the statutory requirements for annexation.

[15] Second, City asserts that the trial court erroneously found that the annexations could not proceed because they would have a significant financial impact on the affected property owners and were not in the best interests of those property owners. We reject City's novel interpretations of the annexation statutes and affirm the trial court's judgment.

## I. Standard of Review

[16] Trial Rule 52 provides the standard of review here, given the trial court's entry of findings of fact and conclusions of law. *See Town of Brownsburg v. Fight Against Brownsburg Annexation*, 124 N.E.3d 597, 600 (Ind. 2019). Under this standard, we review "what the trial court found and concluded, not what the municipality did"—that is, whether the record supports the trial court's decision to uphold or reject the annexation. *Id.* at 601.

In conducting this review, we consider whether the evidence supports the trial court's findings, which will not be set aside unless clearly erroneous. *Id.* Without reweighing the evidence or judging the credibility of witnesses, we will reject a finding as clearly erroneous "only if we are left with the definite and firm conviction, based on all the evidence, that the court erred." *Id.*

Next, the Court considers whether the findings support the trial court's legal conclusions, which we review de novo. *Id.* "The court's ultimate judgment— who wins on which counts or claims, and who loses—must follow from the conclusions of law and is clearly erroneous if the court applied the 'wrong legal standard to properly found facts.'" *Id.* (quoting *Town of Fortville v. Certain Fortville Annexation Territory Landowners,* 51 N.E.3d 1195, 1198 (Ind. 2016). But "[a]nnexation is subject to judicial review only so far as the General Assembly has authorized it by statute, and '[t]he larger object of the annexation statute is, as it has always been, to permit annexation of adjacent urban territory.'" *City of Carmel v. Certain Sw. Clay Twp. Annexation Territory Landowners*, 868 N.E.2d 793, 797 (Ind. 2007) (quoting *Rogers v. Mun. City of Elkhart*, 688 N.E.2d 1238, 1242 (Ind. 1997)).

City suggests this Court must apply an unspecified heightened standard of review due to the trial court's heavy reliance on CRAA's proposed findings and conclusions. But even when the trial court adopts verbatim one party's proposed findings and conclusions, the standard of review does not change; the

reviewing court simply may have less confidence that the findings "are the result of considered judgment by the trial court." *Staff Source, LLC v. Wallace*, 143 N.E.3d 996, 1009 (Ind. Ct. App. 2020) (quoting *Cty. of Lake v. Pahl*, 28 N.E.3d 1092, 1100 (Ind. Ct. App. 2015)).

## II. Annexation Statute

[20] The relevant portions of Indiana Code § 36-4-3-13 (the Annexation Statute) are set forth below:

> (a) Except as provided in subsection (e), at the hearing under section 12 of this chapter, the court shall order a proposed annexation to take place if the following requirements are met:
>
>> (1) The requirements of either subsection (b) or (c).
>>
>> (2) The requirements of subsection (d).
>>
>> (3) The requirements of subsection (i).[5]
>
> (b) The requirements of this subsection are met if the evidence establishes the following:
>
>> (1) That the territory sought to be annexed is contiguous to the municipality.
>>
>> (2) One (1) of the following:
>>
>>> (A) The resident population density of the territory sought to be annexed is at least three (3) persons per acre.
>>>
>>> (B) Sixty percent (60%) of the territory is subdivided.

---

[5] City's compliance with Subsection 13(i), which imposes "outreach program" and notice requirements, is not disputed on appeal.

> > > (C) The territory is zoned for commercial, business, or industrial uses.

> (c) The requirements of this subsection are met if the evidence establishes one (1) of the following:

> > (1) That the territory sought to be annexed is:

> > > (A) contiguous to the municipality as required by section 1.5 of this chapter, except that at least one-fourth ( ¼ ), instead of one-eighth ( ⅛ ), of the aggregate external boundaries of the territory sought to be annexed must coincide with the boundaries of the municipality;

> > > and

> > > (B) needed and can be used by the municipality for its development in the reasonably near future.

> > > \*\*\*

> (d) The requirements of this subsection are met if the evidence establishes that the municipality has developed and adopted a written fiscal plan and has established a definite policy, by resolution of the legislative body as set forth in section 3.1 of this chapter.

> > > \*\*\*

> (e) At the hearing under section 12 of this chapter, the court shall do the following:

> > (1) Consider evidence on the conditions listed in subdivision (2).

> > (2) Order a proposed annexation not to take place if the court finds that all of the following conditions that are applicable to the annexation exist in the territory proposed to be annexed: . . .

(B) The annexation will have a significant financial impact on the residents or owners of land. The court may not consider:

(i) the personal finances; or

(ii) the business finances;

of a resident or owner of land. The personal and business financial records of the residents or owners of land, including state, federal, and local income tax returns, may not be subject to a subpoena or discovery proceedings.

(C) The annexation is not in the best interests of the owners of land in the territory proposed to be annexed as set forth in subsection (f) . . .

(E) This clause applies only to an annexation for which an annexation ordinance is adopted after June 30, 2015. One (1) of the following opposes the annexation:

(i) At least fifty-one percent (51%) of the owners of land in the territory proposed to be annexed.

(ii) The owners of more than sixty percent (60%) in assessed valuation of the land in the territory proposed to be annexed.

The remonstrance petitions filed with the court under section 11 of this chapter are evidence of the number of owners of land that oppose the annexation, minus any written revocations of remonstrances that are filed with the court under section 11 of this chapter.

Ind. Code § 36-4-3-13.

The Annexation Statute "lists the prerequisites for annexation," creating two pathways. *City of Carmel,* 868 N.E.2d at 797. First, a municipality may proceed under subsection 13(b) if the territory to be annexed meets one of three criteria (sometimes referred to as "urban character provisions"):

> (1) resident population density is at least three persons per acre;

> (2) 60% of the territory is subdivided; or

> (3) the territory is zoned for commercial, business, or industrial (CBI) uses.

Ind. Code § 36-4-3-13(b)(2); *see, e.g.*, *Rogers*, 688 N.E.2d at 1240 (using the "'urban character' provisions" language).

Alternatively, a municipality may annex what has been characterized as "[r]elatively rural territory" through subsection 13(c). *Rogers*, 688 N.E.2d at 1240. Under this second pathway, the municipality must prove, among other things, that the territory is "needed and can be used by the municipality for its development in the reasonably near future." Ind. Code § 36-4-3-13(c)(1)(B).

If the municipality meets the requirements of subsection 13(b) or 13(c) and approves a fiscal plan complying with subsection 13(d), "the court must order the annexation to proceed." *City of Carmel,* 868 N.E.2d at 797; *see* Ind. Code § 36-4-3-13(a) (providing that trial court "shall order a proposed annexation to take place" if these requirements are met). Only one exception to this statutory mandate exists. If all the conditions listed in subsection 13(e) are proven—

including that "[t[he annexation will have a significant financial impact on the residents or owners of land" and that "[t]he annexation is not in the best interests" of the landowners of the territory to be annexed—the trial court "shall" order "a proposed annexation *not* to take place." Ind. Code § 36-4-3-13(e)(2)(B)-(C) (emphasis added); *City of Carmel*, 868 N.E.2d at 797-98.

## III. City Proved Neither Pathway to Annexation

[24] As to both Area 1A and Area 1B, the trial court found the requirements of subsection 13(b)—that is, the urban character provisions—were unsatisfied. As to subsection 13(c)—the pathway for relatively rural territory—the court found City did not prove Areas 1A and 1B were needed by City for reasonably near future development. And although City's failure to meet the requirements of subsections 13(b) and 13(c) alone would have been sufficient under these circumstances to reject the annexations, the trial court also found that all the conditions in subsection 13(e) existed and therefore annexation could not proceed.

## A. Subsection 13(b) (Urban Character)

For the annexations to proceed under subsection 13(b), City needed to prove that Area 1A and Area 1B each satisfied at least one of three criteria in the urban character provisions of the Annexation Statute. Ind. Code § 36-4-3-13(b)(2). The trial court found none of these criteria satisfied in either area. City disputes this finding, offering a novel interpretation of the Annexation Statute that we reject.

### i. Subsection 13(b)(2)(B): Subdivision Recording Requirement

[25] The trial court concluded that the annexations did not meet the requirement that 60% of the territory is subdivided. Ind. Code § 36-4-2-13(b)(2)(B). City's proof was lacking, according to the court, because City presented no evidence of the amount of property within Area 1A or Area 1B that is "contained within a formally recorded residential subdivision." App. Vol. II, pp. 85, 88.

[26] City disputes that ruling, contending it presented evidence that 81% of parcels in Area 1A and 94% of parcels in Area 1B were subdivided to less than one acre. Appellant's Br., p. 47 (citing Exh. R-40, found at Exhs. Vol. IV, p. 75). But this evidence does not specify what percentage of these parcels are within *formally recorded residential subdivisions*—the focus of the trial court's conclusion. City's own witness testified she could not "find quality data" pinpointing the number of acres within formally recorded residential subdivisions. Tr. Vol. III, pp. 67-68. Thus, the question before us is whether "subdivided" means "formally recorded residential subdivision," as the trial court determined, or simply "subdivided parcel," as City advocates. App. Vol. II, pp. 85, 88; Appellant's Br., p. 47.

[27] "Subdivided" is not defined in Indiana Code chapter 36-4-3. Our Supreme Court acknowledged in 2019 that it had "not previously defined when land is 'subdivided' under Indiana Code section 36-4-3-13(b)(2)(B)" and "decline[d] to do so" then. *Town of Brownsburg*, 124 N.E.3d at 606. Yet the Court proceeded to

make the following "three observations" to "provide guidance to future litigants and lower courts":

> First, all real property has been subdivided in the broadest sense of the term, so "subdivided" in subsection 13(b)(2)(B) is a narrower term referring only to **formally recorded**, **residential subdivisions** and not other categories of divided real property. Second, the only permissible unit of measurement is acreage and not the number of parcels or tracts of land. Third, all acreage within the proposed annexation territory must be included in the ratio's denominator, and none should be exempted or excluded.

*Id.* (emphasis in original). The Court then went on to state:

> Unlike the trial court, we are agnostic about whether the legislature should define "subdivided" — a key statutory term, to be sure, in many annexation disputes. That is a matter for the legislature. But until or unless the legislature specifies the term's meaning, courts and communities interested in local annexation issues should proceed with these guideposts in mind.
>
> ***
>
> [A]pplying our understanding of 'subdivided', explained above, we agree with the trial court that the disputed annexation area does not meet the statutory sixty-percent 'subdivided' requirement.

*Id.* at 606-07.

[28] City views this passage as *dicta* whereas CRAA joins the trial court in viewing it as binding precedent. While the *Town of Brownsburg* Court did not

comprehensively define "subdivided," it appears to have set basic parameters for the term. *Id.* at 606. Because the Court applied those parameters in affirming the trial court's determination that the 60% subdivided requirement was not met, this suggests that its "guidance" was not mere *dicta*. *Id.* at 607.

[29] Here, the trial court's interpretation of "subdivided" as "formally recorded residential subdivisions" is consistent with these *Town of Brownsburg* parameters. Given City's failure to produce any evidence on acreage within formally recorded residential subdivisions, we find no error in the trial court's determination that City did not prove the annexations complied with section 13(b)(2)(B).

## ii.    Subsections 13(b)(2)(A) and (C): Population Density and CBI Zoning

[30] The trial court found that both Area 1A and Area 1B failed to meet the resident population density and CBI zoning requirements of the Annexation Statute. Ind. Code § 36-4-3-13(b)(2)(A), (C). The trial court determined that Area 1A had only 1.26 to 1.38 persons per acre—short of the 3 persons per acre required by subsection 13(b)(2)(A). As to Area 1B, the court found that City presented conflicting evidence of population density, offering figures ranging from 2.6 to 3.28 persons per acre. The court seemingly rejected the 3.28 figure as based on questionable calculations. The court also found that the percentage of CBI-zoned land in both areas fell short of what is required by the Annexation Statute.

[31] The City, however, proposed in the trial court and on appeal a "hybrid approach" to the calculations under subsection 13(b)(2)(A) and (C).[6] For purposes of these calculations, City essentially divided the area to be annexed, seeking a calculation of population density based only on the residential portions of Area 1A and of Area 1B and a calculation of CBI percentages based only on the portions within Area 1A and Area 1B with CBI zoning.

[32] If this hybrid approach had been used, population density would have been more than three persons per acre in each annexation area and therefore compliant with the population density requirements of subsection 13(b)(2)(A), according to City. City argues that unless the population density calculation is made in this way, municipalities can never annex areas that have mixed dense residential and CBI uses because such areas will never collectively meet the population density requirements.

[33] As to the CBI zoning requirement, City contends this hybrid approach is consistent with *Rogers*, which notes that the "theme of Indiana annexation law has long been that adjoining territory of an urbanizing character was subject to

---

[6] City also challenges the trial court's refusal to consider 2020 census data when calculating population density under subsection 13(b)(2)(A). The Annexation Statute specifies that the most recent federal decennial census "***shall be used*** as evidence of resident population density for purposes of [sub]section 13(b)(2)(A), but this evidence may be rebutted by other evidence of population density." Ind. Code § 36-4-3-13(g) (emphasis added). The trial court chose to rely on old census figures that City had used in notices explaining the annexation to the public as authorized by Indiana Code § 36-4-3-13(g). In any case, any error arising from the trial court's choice of population data evidence is harmless, given our affirmance in section IV of the trial court's determination that subsection 13(e) precluded annexation of Areas 1A and 1B even if the requirements of the Annexation Statute otherwise were met.

annexation." 688 N.E.2d at 1241. This hybrid approach, according to City, also advances the purpose of the annexation statutes in facilitating annexation of adjacent urban land. In *Rogers*, our Supreme Court allowed annexation where 93.4% of territory was CBI zoned, with only "a *de minimis* exception" for minimal residential uses. *Id.* at 1242. The Court emphasized that this exception applied to "an area overwhelmingly zoned for industrial, commercial, and business uses . . . even if a small shard, island, or enclave of land is zoned residential." *Id.* (quoting language of the judgment under appeal).

[34] Here, Area 1B presents the inverse situation. Rather than minimal residential uses in predominantly CBI territory, Area 1B is only about 30% CBI zoned in a predominantly residential area (about 66%). And though Area 1A has more CBI zoning (between 57 and 58%) than residential, the residential portion is still significant (between 42 and 43%). Neither configuration satisfies the *Rogers* standard, which contemplates overwhelming CBI predominance with minimal residential zoning. *See id.* City argues that under its hybrid calculation approach, the CBI zoning would increase to a much higher percentage.

[35] The trial court rejected City's arguments and found that "[t]he statute does not authorize a 'hybrid approach' for satisfying these conditions and must be strictly construed." App. Vol. II, p. 84. We agree and reject both City's hybrid approach and its view that the evidence shows the requirements for population density in Area 1B were met even if the hybrid approach is not employed.

### a. City's Hybrid Argument Ignores the Rules of Statutory Construction

[36] When interpreting the words of a statute that are clear and unambiguous, appellate courts "simply apply their plain meaning, without resorting to other canons of statutory construction." *Rogers v. Martin*, 63 N.E.3d 316, 327 (Ind. 2016). "Otherwise, rather than interpreting an ambiguous statute, [the Court] would be rewriting an unambiguous one." *Ind. Right to Life Victory Fund v. Morales*, 217 N.E.3d 517, 524 (Ind. 2023).

[37] City does not claim that subsections 13(b)(2)(A) and (C) are ambiguous. At best, City's argument assumes that the plain language of subsections 13(b)(2)(A) and (C) permit their hybrid approach by contemplating consideration of less than the full area to be annexed when making calculations under those provisions.

[38] Subsection 13(b)(2)(A) specifies that City must prove "[t]he resident population density *of the territory sought to be annexed* is at least three (3) persons per acre," and section 13(b)(2)(C) similarly refers to "territory" (emphasis added). Neither "territory" nor "territory sought to be annexed" is defined by Indiana Code chapter 36-4-3. But the plain meaning of "territory sought to be annexed" is, respectively, Area 1A and Area 1B, not some select portion within each of those areas. If City had sought to annex only the residential portions or only the CBI portions of Area 1A or Area 1B, it presumably would have excluded the land with other zoning from the annexation ordinances.

In any case, *Town of Brownsburg*, while interpreting the "subdivided" requirement of subsection 13(b)(2)(B), advised future litigants and trial courts that "all acreage within the proposed annexation territory must be included in the [60%] ratio's denominator, and none should be exempted or excluded." *Town of Brownsburg*, 124 N.E.3d at 606. Given our Supreme Court's interpretation of "territory" in subsection 13(b)(2)(B) as the entire proposed annexation area, we conclude this definition also applies to subsections 13(b)(2)(A) and (C). *See Miller v. Patel,* 174 N.E.3d 1061, 1065 n.1 (Ind. 2021) ("[I]t is a normal rule of statutory construction that identical words used in different parts of the same act are intended to have the same meaning.") (quoting *Taniguchi v. Kan Pan. Saipan, Ltd.*, 566 U.S. 560, 571 (2012)). City's hybrid argument, based on a different interpretation of "territory," therefore fails, as the trial court determined.

### b. City Effectively Requests a Reweighing of the Evidence

A second defect in City's argument regarding subsection 13(b)(2)(A) is that the trial court was entitled to resolve conflicting evidence about Area 1B's population. *Garcia v. Garcia*, 789 N.E.2d 993, 997 (Ind. Ct. App. 2003). The court noted discrepancies between City's published figures and calculations prepared specifically for trial—2.6 versus 3.28 persons per acre—raising credibility concerns the court was uniquely positioned to evaluate. City essentially is asking us to reweigh this conflicting evidence, which, in

accordance with the standard of review, we will not do. *See Town of Brownsburg*, 124 N.E.3d at 601.

## B. The Trial Court Properly Concluded that Neither Area 1A nor 1B Met the Requirements of Subsection 13(c) (Relatively Rural)

[41]    City next contests the trial court's finding that the requirements of subsection 13(c) were not met because City failed to prove that the territory in Area 1A or in Area 1B is "needed and can be used by the municipality for its development in the reasonably near future." Ind. Code § 36-4-3-13(c)(1)(B). "Reasonably near future" has been interpreted to mean within four years after enactment of the annexation ordinance, which here occurred in September 2021. *See Town of Brownsburg*, 124 N.E.3d at 609.

[42]    After noting that Subsection 13(c) applies to "relatively rural territory" (*see Rogers*, 688 N.E.2d at 1240), the trial court found that neither Area 1A nor Area 1B appeared "relatively rural." App. Vol. II, pp. 83, 86-87. This conclusion aligns with City's own characterization of the areas as "urbanized" and extensively developed. Appellant's Br., pp. 41-42. Moreover, the statutory language requiring that the territory be "needed and can be used by the municipality for its development" suggests undeveloped land, rather than already urbanized areas. Ind. Code § 36-4-3-13(c)(1)(B).

[43] But in addition to City not meeting the rural territory requirement, the trial court found City had not proven its genuine need to develop the two areas. The court found several problems with City's arguments:

- The current mayor, who opposed the annexation while running for office, testified that the annexed areas were not necessarily needed by City for development and that annexation was necessary because the areas already were receiving and using city services.

- The prior mayor testified the annexations were needed to "right size" City's boundaries.

- Although City alleged Area 1A and 1B were needed for development of affordable housing, private developers—not City—handle housing development.

- City's own policies were inconsistent with any claimed affordable housing shortage, given that City's policy in 2024 was to refuse sewer extensions including for a 35-home development proposed by Habitat for Humanity—an organization that explicitly builds affordable housing.

App. Vol. II, pp. 89-90.

[44] The court also noted that City presented no evidence of any specific plans for development in Area 1A or Area 1B, although it is not clear that such specific plans are required. *Compare Town of Fortville*, 51 N.E.3d at 1199-1202 (affirming trial court's ruling that subsection 13(c) requirements were not met when the municipality offered only general aspirations to develop without concrete evidence of development plans within the reasonably near future), *with Town of Whitestown v. Rural Perry Twp.*, 40 N.E.3d 916, 927 (Ind. Ct. App. 2015) (finding

that the test under subsection 13(c) is whether the municipality could use the annexation area for a purpose other than increased collection of property taxes, meaning the municipality's lack of concrete development plans did not justify trial court's determination that subsection 13(c) requirements were not met).

[45] Although City presented evidence of legitimate affordable housing concerns as well as expert testimony on City's fiscal status, the trial court was entitled to weigh this evidence against contrary testimony and find it insufficient to meet the requirements of subsection 13(c). As previously noted, such credibility determinations receive deference on appeal. *Town of Brownsburg*, 124 N.E.3d at 600. Thus, the core of City's subsection 13(c) challenge amounts to another request to reweigh the evidence that we decline. The trial court did not err in finding that the requirements of subsection 13(c) were not met by either Area 1A or Area 1B.

## IV. The Trial Court Correctly Determined that Areas 1A and 1B Met the Requirements of Subsection 13(e)

[46] Even if a municipality meets the requirements of subsections 13(b) or 13(c) and subsection 13(d), the Annexation Statute requires a trial court to "[o]rder a proposed annexation not to take place if the court finds" that all of a series of applicable "conditions . . . exist in the territory proposed to be annexed." Ind. Code § 36-4-3-13(e)(2). These conditions, applicable to an annexation

ordinance adopted after June 30, 2015 (like that involved here), are:

- The annexation will have a significant financial impact on the residents or owners of land.

- The annexation is not in the best interests of the landowners in the territory proposed to be annexed.

- One (1) of the following opposes the annexation:

    (i) At least fifty-one percent (51%) of the owners of land in the territory proposed to be annexed.

    (ii) The owners of more than sixty percent (60%) in assessed valuation of the land in the territory proposed to be annexed.

Ind. Code § 36-4-3-13(e)(2). The trial court found all the conditions of subsection 13(e) were met, providing another ground on which to reject the annexation.

[47] City challenges the trial court's finding of two of these conditions—the "significant financial impact" condition found in subsection 13(e)(2)(B) and the "annexation is not in the best interests" of the landowners within the areas to be annexed in subsection 13(e)(2)(C). Although CRAA bore the burden of proving the former, City carried the burden of proving "that the annexation is in the best interests of the owners of land in the territory proposed to be annexed." Ind. Code § 36-4-3-13(f); *Town of Whitestown*, 40 N.E.3d at 928.

## A.   "Significant Financial Impact"

The trial court found that the "significant financial impact" condition applied here because:

- Residents of Area 1A, if annexed, would pay more than $11 million in additional property taxes in the first four years following the annexation. The figure would be $9 million for Area 1B residents. In total, the residents of Areas 1A and 1B would pay $8.5 million dollars in additional property taxes in the first year alone.

- The overall tax increase would be about 40 percent. Because these projections are based on outdated assessed property values, the impact likely would be even greater than these projections.

- Although the residents of Areas 1A and 1B would reap some savings in limited categories through annexation, this savings does not "ameliorate the significant financial impact annexation will have." App. Vol. II, p. 94.

- Upon annexation, residents of Areas 1A and 1B would incur increased trash collection charges (mandatory for single-family property owners) and higher stormwater management fees.

City claims the trial court erroneously interpreted the "significant financial impact" condition too broadly by focusing on the tax increase. Annexation typically results in higher taxes so every proposed annexation could be found to have "significant financial impact"—and therefore be halted—under the trial court's interpretation, according to City. City argues that the trial court's approach on this "significant financial impact" issue violates *In re Annexation of Certain Territory to City of Muncie*, 914 N.E.2d 796 (Ind. Ct. App. 2009), and *Town of Whitestown*.

[50] In *City of Muncie*, this Court recognized that all annexations add a municipal tax layer and that subsection 13(e)(2)(B) would be meaningless if any tax increase could negate annexation. 914 N.E.2d at 806. Therefore, a "significant" financial impact is required, according to the *Muncie* Court. *Id.* The Court concluded that the remonstrators had not met their burden of proving a significant financial impact, given that they presented no evidence of the amount of tax increases that annexation would bring or how they would be significantly impacted by such increases. *Id.*

[51] In *Town of Whitestown*, this Court also found the remonstrators' evidence of significant financial impact to be lacking. 40 N.E.3d at 929-930. The Court concluded that the remonstrators were required to prove the annexation "'will have'—that is, would necessarily result in—a significant (and, presumably, adverse) financial effect." *Id.* at 929. The Court concluded that the remonstrators offered no evidence that after the expiration of the annexation ordinance's initial 13-year deferment in imposing a municipal tax layer in property taxes on properties within the annexed area, any significant financial impact would ensue. *Id.* at 929-30.

[52] We are unpersuaded by City's reliance on *City of Muncie* and *Town of Whitestown*. The evidence of a significant financial impact in this case far exceeded that in *City of Muncie* or *Town of Whitestown*, in which there was practically no evidence of financial impact.

[53] Here, CRAA produced evidence that property taxes for the approximate 3,500 parcels in the two areas would increase an average of 40% after annexation— $8.5 million the first year and $20 million over the ensuing four years. Even City's expert testified that in the four years following annexation, property owners in the annexation areas would pay more than $22 million in additional property taxes, although he suggested that City had a comparatively low property tax rate among Indiana cities. And as the trial court found (and City does not appear to dispute), post-calculation spikes in property assessments in the area likely will result in even greater tax burdens.

[54] The evidence also suggested that property owners in Areas 1A and 1B would face other tax increases during that four-year period. First, City's expert testified that upon annexation, Bloomington will incur a bond in the amount of at least $22,112,827 that could be borne, in part, by owners and residents in the annexed areas. Although some residents in Areas 1A and 1B might receive tax offsets due to their individual characteristics (low-income senior citizens, etc.), the evidence did not reveal how many would be entitled to such reductions. One witness testified that after annexation, he would receive between 59 cents and 74 cents in services for every tax dollar he would pay.

[55] Finally, the evidence suggested the property owners would receive little benefit from the higher tax burden. The trial court found, and City does not appear to contest, that the services that City would provide to the Annexation Area were not "appreciably different" than those currently received by these areas. App. Vol. II, p. 62.

[56] Ultimately, City's argument fails to overcome the applicable standard of review, which dictates that findings of fact are set aside only when erroneous and that conclusions of law are reviewed de novo. *Town of Brownsburg*, 124 N.E.3d at 600. City does not challenge the court's individual findings of a $20 million impact over four years, including $8.5 million during the first year alone. City also does not challenge the court's finding of a 40% tax increase plus other extra charges for the limited new services. Those findings, and the evidence underlying them, support the trial court's conclusion and judgment that the conditions of Indiana Code § 36-4-3-13(e) were met.

## B. "Best interests of the property owners"

[57] Even if CRAA proved a significant financial impact, City claims it met its burden under subsection 13(e)(2)(C) of proving annexation was in the best interests of the property owners in Areas 1A and 1B. *See* Ind. Code § 36-4-3-13(f). Because City claims all the conditions of subsection 13(e) were not met, it maintains the trial court erred in rejecting the annexations under subsection 13(e).

[58] The trial court determined that annexation was not in the landowners' best interests because: (1) "a large percentage of owners in such large geographic territories have formally opposed the annexation"; (2) landowners were "overwhelmingly" satisfied with the capital and non-capital services they already receive from county government; and (3) City's police, public works,

and transit departments would have increased responsibility to cover the annexation areas while already stretched thinly. App. Vol. II, pp. 95-96.

[59] City claims the trial court applied the wrong standard. The court used a subjective standard tied to landowner opposition, according to City, rather than an objective standard tied to what is reasonably in the landowners' short- and long-term best interests. City points to no annexation statute or appellate decision requiring an objective standard. But given subsection 13(e) is triggered only when the majority of landowners oppose the annexation, City argues that an objective standard must apply because the remonstrators subjectively will always view the annexation as not in their best interests.

[60] The record contains substantial objective and subjective evidence supporting the trial court's findings and conclusions under subsection 13(e). First, City's evidence that annexation would positively impact residents in Areas 1A and 1B was limited. This evidence focused on City's improved fiscal health after annexation and the availability of new development in the annexed areas for a community lacking sufficient affordable housing. In response, CRAA presented evidence that:

- Landowners in Areas 1A and 1B, upon annexation, would pay significantly more for essentially the same services that they already are getting and that they would not receive any other discernible benefit from the annexation.

- City's police department already is understaffed and has difficulty filling vacant positions, suggesting extending City's police protection to the annexed areas would strain the department further.

- City's Public Works Department also has an employee shortage, and annexation would further dilute its ability to deliver municipal services.

- City's bus service has been understaffed for a decade.

- City has storm drain maintenance issues.

- City's Fleet Maintenance division, which maintains City's municipal services equipment, cannot meet its current obligations due to inadequate staff and likely cannot provide the other services that annexation would require.

- Some residents of Areas 1A and 1B view Monroe County's road maintenance as far superior to that provided by City.

- Some residents of Areas 1A and 1B rarely use City's non-utility services and facilities, such as City parks, and are concerned that they would be paying for services that they do not use if the annexations go forward.

- Some residents of Areas 1A and 1B testified that they prefer the less developed nature of their areas to the more urban attributes of City and do not support high density housing in their areas that might result from annexation.

- Some residents of Areas 1A and 1B testified that City's more restrictive zoning and municipal code ordinances would prevent them from engaging in activities in which they normally engage on their properties such as brush burning and certain property rental activities.

Given this mix of substantial subjective and objective evidence, City's claim is simply another request to reweigh the evidence. We find no error.

## Conclusion

"[T]he judicial role [in annexation cases] is to decide whether the municipality has met the statutory requirements or flouted them." *Town of Brownsburg*, 124 N.E.3d at 604. "Courts may do no more; but we must do that much." *Id.*

The trial court concluded that City's proposed annexation of Areas 1A and 1B did not meet the requirements of the Annexation Statute and that, in any case, subsection 13(e) of the Annexation Statute required the court to halt these two annexations. Finding that City has failed to establish any error in that judgment, we affirm.

Bailey, J., and Brown., concur.

ATTORNEYS FOR APPELLANT

Margie K. Price
Christopher J. Wheeler
Enedina Kassamanian
City of Bloomington
Bloomington, Indiana

Andrew M. McNeil
Stephen C. Unger
Jacob T. Antrium
Bose McKinney & Evans LLP
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

William J. Beggs
Ryan M. Heeb
Bunger & Robertson
Bloomington, Indiana